# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-0401V

| | |
|---|---|
| JASON BROSE,<br><br>　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　Respondent. | Chief Special Master Corcoran<br><br><br>Filed: March 19, 2026 |

*David John Carney, Green & Schafle, LLC, Philadelphia, PA, for Petitioner.*

*Elizabeth Andary, U.S. Department of Justice, Washington, DC, for Respondent.*

### <u>RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES</u>[1]

On April 7, 2022, Jason Brose filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine he received on November 9, 2020, he suffered a left shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons set forth below, I find it most likely that Petitioner's history of left shoulder symptoms does not explain the alleged signs, symptoms and findings after

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

vaccine injection, that Petitioner suffered the onset of his shoulder pain specifically within 48 hours of vaccination, and that he is otherwise entitled to compensation. I also find that Petitioner should be awarded **$48,000.00** for his actual pain and suffering.

## I.    Relevant Procedural History

This claim was initiated on April 7, 2022, and relevant medical records were filed thereafter. ECF No. 1-8, 17-18. Although the parties attempted to informally resolve this case, they were unable to do so. Petitioner filed a Motion for Ruling on the Record and Brief in Support of Damages ("Mot.") on September 25, 2023. ECF No. 25.  Respondent filed his Rule 4(c) Report and Response to Petitioner's Motion ("Opp.") on November 27, 2023, ECF No. 34. Petitioner filed a Reply ("Reply") on December 10, 2023, ECF No. 28.

## II.    Relevant Medical History

*Pre-vaccination History*

For many years, Mr. Brose has experienced various left shoulder symptoms. In September 2016, while attending physical therapy ("PT") for complaints of left shoulder pain, Mr. Brose told his physical therapist that he had chronic left shoulder pain and that "[a]bout 16 years ago he had a cortisone shot in the left shoulder and was told he had bicipital tendonitis." Exhibit ("Ex.") 4 at 17, 19. However, he also stated that the "pain had resolved over time," and that he and his wife were working out again and using weights and doing pushups. *Id*. Petitioner reported that he had a recent MRI of his left shoulder which showed calcific tendonitis, and that he had also recently received a cortisone injection to his left shoulder. *See Id*. Mr. Brose attended seven PT sessions for his left shoulder through November 21, 2016. *Id*. at 4.

One year later, on December 5, 2017, Mr. Brose returned to PT for complaints of left shoulder pain. Ex. 4 at 125. He reported that his left shoulder pain began the prior March and that he had problems sleeping, reaching, and worsening range of motion ("ROM"). *Id*. Petitioner stated that he had received a cortisone injection six weeks prior that improved some of his pain. *Id*. A recent x-ray was consistent with calcific tendonitis, and Mr. Brose reported that his doctor had diagnosed him with left rotator cuff syndrome, calcific tendonitis, and mild adhesive capsulitis. *Id*. On exam, Petitioner had positive impingement testing and some tenderness. *Id*. at 126-27. The PT assessment was left rotator cuff syndrome, left impingement syndrome, and possible left labral pathology. *Id*. at 127. Petitioner attended six PT sessions for his left shoulder and was discharged on January 23, 2018. *See id*. at 110-11.

2

*Post-Vaccination*

More than two and a half years later, on November 9, 2020, Mr. Brose (40 years old) received an intramuscular flu vaccine in his left deltoid from Acme Pharmacy located in Chester Springs, Pennsylvania. Ex. 1 at 7. In his affidavit, Petitioner stated

> Both the nurse and I were sitting down when she injected the influenza vaccine into my left shoulder. Immediately this injection did not feel like past injections, meaning that I felt a lot of pressure and it almost felt as if I could feel the actual vaccine being plunged into my shoulder joint. The nurse placed a band aid over the injection site and told me that "it may hurt for a day or two."
>
> After getting the flu shot, my left shoulder felt sore and painful that same day, and I was experiencing pain in the shoulder that I had never experienced with prior vaccinations. Over the following couple of days, my left shoulder pain began to really intensify and worsen. The pain did not feel like routine shoulder discomfort from a flu shot and I had never had this level of pain after a vaccine before. However, I was told by the nurse that this was common, and it would hurt for a couple of days. However, after waiting for a couple of weeks, the pain had not subsided at all and in fact, the pain was getting progressively worse. My left arm and shoulder were in constant pain all day long and I could barely raise my left arm.

Ex. 2 at 1-2.

About six weeks after vaccination, on December 23, 2020, Mr. Brose saw orthopedist Kelly Murray, M.D., for "sudden" left shoulder pain, and reported:

> History of Present Illness (Kelly Murray MD; 12/30/2020 2:45 PM) The patient is a 40 year old male who presents with a complaint of shoulder pain. The onset of the shoulder pain has been sudden and has been occurring for 6 weeks. The course has been gradually improving. The shoulder pain is mild to moderate. The shoulder pain is characterized as a dull aching. The shoulder pain is described as being located in the left shoulder … Patient reports that he received a flu vaccine on November 9th at a local pharmacy. He reports the vaccine was placed higher than typically and had a weird sensation in his shoulder at the time of injection. He subsequently was unable to raise his left arm a few days after the injection. He reports that his symptoms have slowly improved with time. Advil helps the

3

> symptoms as well as stretching. He was seen here for his left shoulder in November of 2017 with similar symptoms. At that time he was treated with a cortisone injection and physical therapy. He reports no trouble with the shoulder until this flu vaccination. He is right-hand dominant and works in sales…

Ex. 3 at 8. On exam, Petitioner's ROM was normal, and he had no impingement signs. *Id*. Dr. Murray diagnosed Mr. Brose with left shoulder bursitis and noted that Petitioner "developed an acute shoulder bursitis secondary to his flu vaccination being done too high and likely was injected into the subacromial space." *Id*. A subacromial cortisone injection was administered to Petitioner's left shoulder, and he was referred to PT. *Id*.

Mr. Brose began left shoulder PT on December 29, 2020, at Kinetic Physical Therapy. Ex. 3 at 16. The notes from this visit state:

> **Assessment/Diagnosis**: The pt is a 40 y/o male who presents to Kinetic with a diagnosis of LUE pain with an insidious onset. The pt reported that he thinks it all started after he received a flu shot which occurred sometime on or around November 9th and then a few days later the pain into the L shoulder started. From that point, he had an insidious and consistent pain in the left shoulder that has affected his ability to exercise and sleep. Pain:7/10 worst and 3/10 at best.

Ex. 4 at 183. The physical therapist indicated that Mr. Brose had "a history of [the] present problem," but that there were no factors that would impact the plan of treatment. *Id*. On exam, Petitioner had some reduced ROM in his left shoulder relative to his right, and one positive left shoulder impingement test. *Id*.

On December 30, 2020, Mr. Brose returned to Dr. Kelly Murray, who noted Petitioner's ongoing issues and recommended another cortisone injection:

> Based on patient's history and symptoms, I explained that he developed acute shoulder bursitis secondary to his flu vaccination being done too high and likely was injected into the subacromial space. His symptoms have definitely improved with time and taking Advil. We discussed the option of the cortisone injection as he is still having difficulty with sleep at night. He ultimately elected to proceed with another injection.

Ex. 3 at 8. Petitioner was encouraged to continue with PT, and was to be reevaluated after six weeks. *Id*.

Mr. Brose attended nine PT sessions through January 28, 2021. Ex. 4 at 134-66. At his eighth appointment on January 25, 2021, Mr. Brose reported that he had tried circuit training with overhead dumbbell shoulder presses. Ex. 4 at 142. Although he "had difficulty locking out the [dumbbell] shoulder press at first," he "was able to lockout fully from reps 5-10." *Id*. Petitioner was discharged to a home exercise program on January 28, 2021. *Id*. at 139. He subjectively reported a 50% improvement in symptoms. *Id*. at 136. On exam, his left shoulder ROM was within functional limits, but he still had some slight reduction in left shoulder strength relative to his right. *Id*. at 137. In terms of his long- and short-term goals, petitioner was at 95% towards reducing his pain to 0/10 at rest. *Id*. at 139. He had met his goal of restoring his ROM and was at 80% towards his goal of reducing pain with activities to 0/10, and 90% towards his goal of restored left shoulder strength. *Id*.

However, on February 3, 2021, Mr. Brose returned to Dr. Murray in follow-up. Ex. 3 at 6. Although Dr. Murray noted that Petitioner's "course has been gradually improving," Mr. Brose reported "no significant improvement with his symptoms." *Id*. Petitioner stated that the cortisone injection did not help and that PT had aggravated his shoulder. *Id*. On examination, Petitioner had normal left shoulder strength but some reduced ROM on exam. *Id*. Dr. Murray recommended additional MRI imaging because Petitioner's exam was "suggestive of some biceps labral complex signs," as well as a possible superior labrum anterior-to-posterior ("SLAP") tear of the left shoulder. *Id*. at 7. Dr. Murray counseled Petitioner to stop PT and prescribed a Medrol Dosepak. *Id*.

Mr. Brose did not seek medical treatment for his left shoulder for the next four-and-a-half months. On July 26, 2021, Petitioner returned to see Dr. Murray, who diagnosed him with a superior glenoid labrum lesion of the left shoulder. Ex. 7 at 7. Mr. Brose reported a dull pain in his left shoulder and clicking. *Id*. He had not undergone the previously recommended MRI because he was reportedly concerned about the cost. *Id*. Dr. Murray again encouraged Petitioner to obtain another MRI of his left shoulder. *Id*. at 8. No additional records have been filed.

In his affidavit, Mr. Brose states that he has experienced ongoing pain, suffering, discomfort, and decreased range of motion in his shoulder since the onset of his shoulder injury and he still experiences significant residual effects. *Id*. at 3. He describes difficulty sleeping and with his daily routine, as well as trouble living a full life due to his ongoing and persistent shoulder injury. *Id*. Petitioner states that he is unable to engage in activities that were once a great joy for him, such as tennis, fishing, baseball, and golfing, and he is also unable to do yard work, and other maintenance around the house due to his shoulder injury. *Id*. at 5.

## III.    Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined.

*Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## Analysis

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42

Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at \*5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## I.   Factual Findings Regarding a Table SIRVA

Respondent has contested two SIRVA QAI requirements in Mr. Brose's case – a prior abnormality that would explain his condition after vaccination and onset. After a review of the entire record, and as set forth below, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

### A. *No History of Left Shoulder Symptoms that Would Explain Symptoms After Vaccination*

In order to meet the definition of a Table SIRVA, a petitioner must show that there is "no history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." (42 C.F.R. § 100.3(a)(XIV)(B)) and § 100.3(c)(10)(i) (QAI criteria)).

Respondent argues that Petitioner had a longstanding history of pain, inflammation, or dysfunction in his left shoulder. Opp. at 8. Beginning in 2000 and continuing for almost 20 years thereafter, Respondent argues that Petitioner received cortisone injections and attended PT for his chronic left shoulder pain. *Id*. In addition, Respondent noted that Mr. Brose received diagnoses of calcific tendonitis, bicipital tendonitis, rotator cuff syndrome, and adhesive capsulitis in the left shoulder. *Id*. Thus, Respondent argues that Petitioner's treatment and symptoms were same both pre and post vaccination. *Id*.

While it is certainly true that Mr. Brose had a prior history of left shoulder symptoms, the QAI states that a petitioner must have no history of pain, inflammation or dysfunction of the affected shoulder that would explain the symptoms *after* vaccine injection. That standard is not met here. Looking at the record, Mr. Brose's left shoulder symptoms appeared to have resolved in the two to three years prior to vaccination. He was discharged from PT on his left shoulder on January 23, 2018, two years and nine months prior to vaccination, and he had no documented left shoulder symptoms during that time. Indeed, during Mr. Brose's first evaluation for his shoulder pain, his orthopedic surgeon noted, "[Petitioner] reports no trouble with the shoulder until this flu vaccination." Ex. 3 at 8.

In addition, Petitioner's orthopedist diagnosed Mr. Brose with left shoulder bursitis, stating that Petitioner "developed an acute shoulder bursitis secondary to his flu vaccination being done too high and likely was injected into the subacromial space." *Id*. Thus, the symptoms that Mr. Brose experienced right after vaccination are not explained by his prior symptoms, and Petitioner meets this QAI criterion.

### B. Pain Occurs with the Specified Timeframe (Onset)

In order to meet the definition of a Table SIRVA, a petitioner must show that she experienced the onset of pain within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and § 100.3(c)(10)(ii) (QAI criteria)). Respondent argues that Petitioner "has not established that the onset of his alleged SIRVA began within forty-eight hours of vaccination." Opp. at 9. But it is important to stress that this QAI only requires that the onset of shoulder *pain* begin within 48 hours of vaccination - not that all SIRVA symptoms begin within 48 hours, as Respondent posits.

Respondent argues that because Mr. Brose waited six weeks before he saw an orthopedist for treatment of his left shoulder pain, the delay is not consistent with Petitioner's claim that he had "unprecedented, intense pain and discomfort in the days after vaccination." Opp. at 9. Respondent also contends that Petitioner's statements regarding onset were "vague," citing to references in the record where Mr. Brose stated

that he "thought" his shoulder pain started after he received a flu shot. *Id*. However, I find these arguments to be unpersuasive. But Respondent has cited only the references in the record that support his argument, when the complete record shows a different picture.

As a threshold matter, I note that six weeks is not an unreasonable time to wait before a claimant might seek treatment for shoulder pain after vaccination. As I have stated in many other decisions and rulings discussing SIRVA injuries, a petitioner will often delay treatment because shoulder pain is a very common side effect after vaccination. Many medical providers will counsel a patient to wait a period of time before being seen to allow the expected shoulder pain to subside. Thus, the treatment delay in this case is not worthy of significant weight in determining the disputed onset criterion.

On December 23, 2020, which was the first time Petitioner was seen after vaccination, Mr. Brose reported to the orthopedist that "t[]he onset of the shoulder pain has been sudden and has been occurring for 6 weeks," which is exactly when Petitioner got his vaccination. Ex. 3 at 8. The record also states that Petitioner "received a flu vaccine on 11/9 at a local pharmacy and the vaccine was placed higher than typically and he had a weird sensation in his shoulder *at the time of injection*." *Id*. (emphasis added). When Petitioner began PT on December 29, 2020, he reported

> **Assessment/Diagnosis:** The pt is a 40 y/o male who presents to Kinetic with a diagnosis of LUE pain with an insidious onset, The pt reported that he thinks it all started after he received a flu shot which occurred sometime on or around November 9th and then a few days later the pain into the L shoulder started.

Ex. 3 at 16. The next day, on December 30, 2020, Dr. Murray noted that Petitioner "developed acute shoulder bursitis secondary to his flu vaccination being done too high and likely was injected into the subacromial space." Ex. 3 at 8. I find these reports to be credible and consistent with all his other reports that his shoulder pain began within 48 hours of receiving the vaccination. Thus, I find that Mr. Brose has preponderantly met the 48-hour onset requirement.

### A. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

11

The record shows that Petitioner received a flu vaccine intramuscularly in his left shoulder on November 9, 2020. Ex. 1 at 7; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 5; Section 11(c)(1)(E) (lack of prior civil award). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criterion which must be satisfied by Petitioner involves the duration of his SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from October 2, 2020 (24 hours after vaccination), the records undoubtedly demonstrate that Petitioner suffered the residual effects of his shoulder injury for more than six months. *See*, *e.g.*, Ex. 7 at 7 (records of Petitioner's appointment with Dr. Murray). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## IV. <u>Damages</u>

### I.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594,

at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

## II.   Parties' Arguments

### a.  Petitioner

Mr. Brose has requested $65,000.00 in pain and suffering. He argues that he reported his injury just six weeks after vaccination, and his treatment consisted of visits to his primary care provider and orthopedist, nine sessions of physical therapy, two cortisone injections, an MRI, and a Medrol Dosepak. Mot. at 26-27.

Petitioner cites to four cases to support his requested award: (1) *Sakovitz v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420 at *3(Fed. Cl. Spec. Mstr. June 4, 2020), (2) *Belka v. Sec'y of Health & Human Servs.*, No. 19-1106V, 2022 WL 4717891 at *6 (Fed. Cl. Spec. Mstr. Sept. 1, 2022), (3) *Cavalier v. Sec'y of Health & Human Servs.*, No. 21-5500404, 2023 WL 5500404 at *5 (Fed. Cl. Spec. Mstr. Jul. 25, 2023) and *Celuch v. Sec'y of Health & Human Servs.*, No. 18-544V, 2021 WL 2368137 at *4 (Fed. Cl. Spec. Mstr. Aug. 7, 2019). Mr. Brose states that he continues to have pain and discomfort in his left shoulder, which affect his daily life, hobbies and activities of daily living. Ex. 2 at 4.

### b. Respondent

Respondent argues that Petitioner suffered a mild SIRVA injury, and should therefore be awarded an amount consistent with cases with similar injuries. In that respect, Respondent has argued that an award for pain in suffering in the amount of $39,500.00 is appropriate. Opp. at 12.

Respondent notes that Petitioner's treatment was concentrated in a onetime six-week period, between December 23, 2020, and February 3, 2021, that was then followed by a gap in any alleged SIRVA medical records until July 26, 2021. In addition, Respondent notes that Petitioner underwent very conservative treatment consisting of one steroid injection and a total of nine PT sessions. At Petitioner's last PT session, Mr. Brose was discharged to a home exercise program on January 28, 2021. Opp at 14; Ex. at 139. Consequently, by the time Petitioner saw his orthopedist in February 2021, he had already been discharged from PT thus making his orthopedist's instruction to "stop" a moot point.

Because of these differences, Respondent argue that the cases cited by Petitioner in support of his claim for $65,000.00 in pain and suffering are distinguishable, and Respondent cites to the *Ramos* case in support of his proposed award. *Ramos v. Sec'y of Health & Human Servs*., No. 18- 1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021).

### III.   Appropriate Compensation in this SIRVA Case

### a.  Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Mr. Brose was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of his injury. When performing this analysis, I review the same record relied upon to determine entitlement, including the filed affidavits and medical records, and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases.

The record establishes that Mr. Brose suffered a mild SIRVA injury which did not necessitate surgery. His treatment course was conservative and limited. His left shoulder symptoms were managed mostly two steroid injections and just nine PT sessions. There is also an approximately four-and-a-half-month gap in his treatment course is also consistent with a milder type of injury. *See Shelton v. Sec'y of Health & Human Servs.*,

No. 19-279V, 2021 WL 2550093, at *7 (Fed. Cl. Spec. Mstr. May 21, 2021) ("[t]he fact that petitioner could cope with her injury for such a long period of time counsels in favor of a lower pain and suffering award. Treatment gaps are a relevant consideration in determining the degree of petitioner's pain and suffering"). His actual treatment course, when he did seek out medical advice, as Respondent has noted, was concentrated in a onetime six-week period between December 23, 2020, and February 3, 2021, that was then followed by a gap in any alleged SIRVA medical records until July 26, 2021. Opp. at 14. Mr. Brose's total treatment course was eight and a half months, and only four months if the treatment gap is excluded.

Petitioner cites four cases in support of his request for $65,000.00 in pain and suffering - *Sakovitz*, *Belka*, *Celuch,* and *Cavalier*. However, in all of these cases the petitioners received more treatment than Mr. Brose did, and/or had a much longer treatment period. While the *Sakovitz* claimant delayed seeking treatment for three and a half months, her treatment course consisted of one cortisone injection, one MRI and a total of 34 PT sessions. The *Belka* petitioner attended 24 PT sessions and had two cortisone injections. *Belka*, 2022 WL 4717891 at *4. Her duration of injury was also longer than Mr. Brose's, at 13 months. *Id*. at *6. While there was a longer delay in initial treatment in the *Belka* case at six months, there is no gap in treatment once Petitioner began treatment. *Id*. at *5. The *Celuch* petitioner was first seen for her shoulder pain two months after vaccination. She underwent an MRI, received one cortisone injection, and underwent 24 PT sessions. She recovered approximately eight months after vaccination and was awarded $70,000.00 in pain and suffering. 2021 WL 2368137 at *4. In *Cavalier*, the petitioner attended an initial PT session on March 12, 2020, which was then interrupted by the COVID-19 pandemic. 2023 WL 5500404 at *5. Petitioner also received two cortisone injections. *Id*. at *6. There was a six-month gap in treatment between the *Cavalier* petitioner's receipt of the second cortisone injection in June 2020, before she returned to treatment in mid-December 2020, and ultimately attended 12 additional PT sessions, for a total of 13 PT sessions. *Id*.

Respondent, on the other hand, cites a single case, *Ramos,* where a claimant was awarded $40,000.00 in pain and suffering. 2021 WL 688576. However, there are also some notable differences in the *Ramos* case which make it less appropriate as a comparable case. The *Ramos* petitioner delayed seeking treatment for his injury for more than four months, or 121 days. 2021 WL 688576, *1. And as Respondent noted, the petitioner in *Ramos* did not receive any steroid injections, which is an indication as to the severity of the shoulder injury. Thus, I will award Mr. Brose a higher amount than was awarded in *Ramos*.

I will note that the medical records do not show that Mr. Brose underwent an MRI during his treatment period as he indicates, i.e., from the date of vaccination through the end of the filed medical records, which are dated July 26, 2021. The only MRI that is contained within the records is an MRI from 2016 which Petitioner underwent *prior* to vaccination. Ex. 4 at 17, 19 (discussing Petitioner's 2016 left shoulder MRI); Ex. 9 at 5 (2016 left shoulder MRI results). Thus, in analyzing Mr. Brose's case against the comparable cases he cited, I will note that he did *not* undergo an MRI on his left shoulder after vaccination. The records also show that Mr. Brose received two steroid injections, despite Respondent's assertion that Petitioner only received one. *See* Ex. 3 at 8 (documenting second steroid injection). Thus, while the cases cited by Petitioner are not persuasive comparable cases because each of the petitioners received more treatment and/or had longer treatment length, the single case cited by Respondent is also not a persuasive comparable since that petitioner had a lengthy delay before treatment and did not receive as much treatment as Mr. Brose.

Under such circumstances and considering the arguments presented by both parties, a review of the cited cases, and based on the record as a whole, I find that **$48,000.00** in compensation for Mr. Brose's past pain and suffering is reasonable and appropriate in this case.

## **CONCLUSION**

Based on my consideration of the complete record as a whole and for the reasons discussed above, pursuant to Section 12(d)(3)(A), **I find that $48,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[4] Accordingly, I award Petitioner a lump sum payment of $48,000.00, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[5]

---

[4] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master